# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| METROGATE, LLC f/k/a ADVANCE | ) | Case No. 15-12593 (KJC) |
| REALTY GROUP, LLC, | ) | |
| | ) | Chapter 11 (Involuntary) |
| Alleged Debtor. | ) | |
| | ) | |
| | ) | |
| _____ | ) | D.I. 1, 16, 19 |

## OPINION

### BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

### BACKGROUND

**Procedural Background**

On December 22, 2015, by and through their collateral manager or attorney-in-fact, TP
Management LLC ("TP Management" or "TPM"), four funds filed an involuntary petition for
relief under Chapter 11 of the United States Bankruptcy Code (the "Involuntary Petition")
against the alleged debtor, Metrogate LLC f/k/a Advance Realty Group, LLC ("ARG")
(hereinafter "Metrogate").[1] (D.I. 1.) On January 13, 2016, Metrogate filed the Motion to Dismiss
Involuntary Petition and Request for Award of Damages, Fees, and Costs for Bad Faith Filing
(the "Metrogate MTD"), asserting that the petition for relief cannot be granted because the

---

[1] Taberna Preferred Funding I, Ltd. ("Fund I"), Taberna Preferred Funding II, Ltd. ("Fund II"), Taberna Preferred
Funding IV, Ltd. ("Fund IV"), and Taberna Preferred Funding VI, Ltd. ("Fund VI" collectively the "Funds" or the
"Petitioning Creditors"). The Petitioning Creditors' admitted documents are referred to as "PC Ex. ___." Alleged
debtor Metrogate's admitted documents are referred to as "Metrogate Ex. ___." All Metrogate exhibits referenced
within were admitted at the 2/22/16 hearing when the Court heard the testimony of John D. McGurk. Items on the
docket for Case No. 15-12593 are referred to as "D.I. ___."

Petitioning Creditors do not meet the numerosity requirements of 11 U.S.C. § 303 and that there is a bona fide dispute as to the liability or amount with regard to the Petitioning Creditors' claims.[2] (Metrogate MTD ¶¶ 1-5, D.I. 16, at 1-3.) Metrogate also asserts that the Involuntary Petition was filed as a bad faith litigation tactic soon after the Petitioning Creditors were denied leave to amend much of their 2013 complaint in a pending action in New York State Court (the "2013 Complaint" and the "NY State Action"), which resulted in the rejection of several of their claims, and have come to bankruptcy court as an exercise in forum shopping. (Metrogate MTD ¶ 40, D.I. 16, at 16.) On January 20, 2016, the Petitioning Creditors filed combined Motions for Summary Judgment on the December 22, 2015, Involuntary Petition and the Involuntary Debtor's January 13, 2016, Motion to Dismiss (jointly, the "SJ Motions").[3] (D.I. 19.) Limited discovery was conducted, both sides took depositions, and this Court held multiple evidentiary hearings relating to both the Metrogate MTD and the SJ Motions, which included: (i) testimony from three witnesses, (ii) admitted documents that were presented at the hearing, and (iii) oral argument. (D.I. 27, 33, 34, 42, 64, 68, 81.) The Court has the benefit of a voluminous record, extensive briefing, and the arguments of able counsel in reaching a decision.

For the reasons stated below, Metrogate's MTD will be granted. In light of my disposition of the Metrogate MTD, the SJ Motions will be denied as moot.

---

[2] Along with the Metrogate MTD was submitted the Decl. of John McGurk in Supp. of Alleged Debtor Metrogate, LLC's Mot. to Dismiss Involuntary Pet. and Req. for Award of Damages, Fees and Costs for Bad Faith Filing ("McGurk Decl."). PC Ex. 1, D.I. 16 Ex. A.

[3] On the same day, the Petitioning Creditors filed the Pet. Creditors Mem. of Law in Opp'n to Dismiss and in Supp. of Mots. for Summ. J. Under Fed. R. Bankr. P. 1018 and 7056 ("PC Mem."). D.I. 20. Attached was the Decl. of Morgan J. McClure in Supp. of the Mot. for Summ. J. with Respect to: (1) the December 22, 2015, Voluntary Pet. Filed by [the Funds]; and (2) the January 13. 2016, Mot. to Dismiss Filed by ARG N/K/A Metrogate, LLC ("McClure Decl."). Metrogate Ex. 1, D.I, 21. On February 13, 2016, Metrogate filed the Alleged Debtor Metrogate, LLC's (I) Reply to Opp'n to Mot. to Dismiss and (II) Obj. to Mot. for Summ J. under Fed. R. Bankr. P. 1018 and 7056 ("Metrogate Reply & Obj."). D.I. 47. Attached was the Suppl. Decl. of John D. McGurk in Resp. to Pet. Creditors' (A) Opp'n to Alleged Debtor's Mot. to Dismiss and (B) Mot. for Summ. J. under Fed. R. Bankr. P. 1018 and 7056 ("Suppl. McGurk Decl."). Metrogate Ex. 14, D.I. 47-1. On February 18, 2016, the Petitioning Creditors filed the Pet. Creditors Reply in Supp. of Mots. for Summ. J. Under Fed. R. Bankr. P. 1018 and 7056 ("PC Reply"). D.I. 55.

**Factual Background**

Metrogate, LLC is a is a Delaware LLC formed on July 1, 2001 for the purpose of buying, leasing, developing, selling, and investing in residential real estate. Metrogate is owned as follows: 88.5%—Almanac Realty Securities III, LLC ("ARS"); 8.9%—ELD Partners LP; 1.3%—Gary Sopko; and 1.3%—Nick Stathakis. Metrogate's board of directors is comprised of two representatives of ARS, D. Pike Aloian and John D. McGurk, and one representative of Advance Capital Partners LLC ("ACP"), Peter J. Cocoziello. Mr. McGurk is also the Vice President and Secretary of Metrogate, LLC.

Morgan McClure is an authorized signatory of TP Management, the collateral manager or attorney-in-fact for the Funds.[4] Specifically, TP Management is the successor collateral manager for Fund IV and Fund VI and is the "Delegate" (as defined in the Delegation Agreements) of Taberna Capital Management ("TCM"), as collateral manager to Fund I and Fund II. The Funds are exempted Cayman Islands companies and issuers of collateralized debt obligations ("CDOs"), which are issued pursuant to the CDO Indentures. Mr. McClure's collateral management duties include taking necessary enforcement actions in connection with the Metrogate debt.

### The 2001 FARS Loan

TP Management alleges as follows: In 2001, Metrogate sought and accepted an investment from Rothschild Realty, Inc. and Rothschild Realty Managers, LLC n/k/a Almanac Realty Investors, through an investment fund known as Five Arrows Realty Securities III

---

[4] As authorized by: (a) Collateral Management Agreements, dated March 15, 2005, December 23, 2005, and June 27, 2006; (b) the CDO Indentures, of the same dates; (c) the Master Transaction Agreements, dated April, 21, 2010, and December 1, 2014, by and among TCM, RAIT Financial Trust, and TP Management; and (d) the Delegation Agreements, dated April 21, 2010, and December 1, 2014, by and among TCM, RAIT Financial Trust, and TP Management (collectively, the Collateral Management Agreement, CDO Indentures, and Delegation Agreements are the "CDO Management Agreements").

("FARS") n/k/a Almanac Realty Securities III, LLC (ARS). ARS' senior management team includes D. Pike Aloian and John D. McGurk. In late summer 2001, Metrogate (then ARG) and FARS entered into an agreement in which FARS agreed to loan $60 million to Metrogate pursuant to a Convertible Promissory Note. Under the Credit Agreement, FARS could convert all or part of its debt to Metrogate common units at a strike price of $16.65 per unit. This gave FARS the right to convert its debt into 3.6 million units, which was intended to give it majority ownership of Metrogate.

<u>The March Note</u>

In March 2005, Metrogate created a trust—Advance Realty Group Capital Trust I, a Delaware statutory trust ("Trust I"), which issued preferred stock to Fund I in exchange for $25 million. Trust I loaned the proceeds of the preferred stock issuance to Metrogate pursuant to a Junior Subordinated Indenture dated March 15, 2005, between Metrogate and JPMorgan Chase Bank, N.A.[5] (the "March Indenture"). A Floating Rate Junior Subordinated Note due in 2035 in the original principal amount of $25,780,000 was held by Trust I for the benefit of the holders of the preferred stock (the "March Note"). Metrogate paid Trust I under the March Note, which then made the payments to Fund I. Trust I is governed by the Amended and Restated Trust Agreement, dated March 15, 2005 (the "March Trust Agreement").

<u>The October Note and the Subordination Agreements</u>

In October 2005, Metrogate created another Delaware statutory trust ("Trust II," together with Trust I, the "Trusts"), which issued preferred stock to Funds II, IV, and VI in exchange for

---

[5] JP Morgan Chase Bank, NA was the original trustee. The Bank of New York Mellon Trust Company ("BNYM") succeeded JP Morgan. In March 2015, BNYM was removed as property trustee and trustee under the Indentures. Computershare Trust Company, N.A. ("Computershare") was appointed successor trustee under the Indentures and as successor property trustee under the Trust Agreements.

$35 million, split as follows: Fund II loaned $6,875,000; Fund IV loaned $24,375,000; and Fund VI loaned $3,750,000. Trust II loaned the proceeds of the preferred stock issuance to Metrogate pursuant to a Junior Subordinated Indenture between Metrogate and JP Morgan (the "October Indenture," together with the March Indenture, the "Indentures"). A Floating Rate Junior Subordinated Note due in 2035 in the original principal amount of $36,090,000 is held by Trust II (the "October Note," together with the March Note, the "Notes") for the benefit of Funds II, IV, and VI. Metrogate pays Trust II under the October Note, which then transfers the payments to Funds II, IV, and VI. Trust II is governed by the Amended and Restated Trust Agreement, dated October 14, 2005 (the "October Trust Agreement," and together with the March Trust Agreement, the "Trust Agreements").

At the same time as the parties entered into the Indentures, the parties also executed agreements subordinating any payments of the 2001 FARS loan to the new Trust loans (the "Subordination Agreements"). (PC Ex. 63, 66.)

Metrogate has not made any payments under the Indentures since October 2009. On October 23, 2009, and February 9, 2010, TCM issued default letters to Metrogate on behalf of the Funds and accelerated the obligations due under the Notes.

<u>The 2007 and 2008 Conversion Agreement</u>

TP Management alleges that in a 2007 and 2008 restructuring, Metrogate insiders took millions of dollars in cash, spun off Metrogate's commercial real estate in a redemption of their majority equity holdings, and undertook numerous avoidable transfers, all while Metrogate was allegedly insolvent or which alleged actions rendered them so. Specifically, TP Management asserts that: (a) Without the Funds' consent, FARS converted its $60 million junior loan to Metrogate into over $80.1 million purported senior debt, plus new controlling equity;

(b) Metrogate (and the NY State Action Defendants) transferred commercial real estate worth over $45 million to Mr. Cocoziello and his affiliated entities and incurred over $52 million in new financial obligations to these entities without fair consideration; (c) Metrogate (and the NY State Action Defendants) (i) paid millions to themselves and related entities from Metrogate; (ii) caused Metrogate to pay interest on loans that did not require interest payments; and (iii) caused Metrogate to gratuitously and fraudulently guarantee new indebtedness, all for the Defendants' benefit.[6]

<u>Delaware Chancery Court—Minority Shareholder Action against Metrogate</u>

In 2008, certain minority shareholders filed an action against Metrogate in the Court of Chancery of the State of Delaware (the "Delaware Chancery Court" case) asserting causes of action in connection with the reorganization of Metrogate in 2008 (the "Conversion Agreement") for: (i) breach of fiduciary duty; (ii) breach of the implied covenant of good faith and fair dealing, fraudulent inducement, civil conspiracy; and (iii) aiding and abetting breach of fiduciary duty. The Funds had a limited intervention in the Delaware State Court Action. After trial, the Delaware Court found that there were no damages as, despite self-dealing by the board, the equity value improved, and so dismissed the claims.

<u>The NY State Action</u>

On June 7, 2013, TP Management sent a "Notice of Continuing Events of Default and Continuing Acceleration of Outstanding Indebtedness Under the Indenture; Demand for Performance; Reservation and Non-Waiver of Rights; Demand for Strict Compliance," in

---

[6] The full list of the NY State Action Defendants: Advance Realty Group LLC n/k/a Metrogate LLC; Advance Capitual Partners, LLC; Advance Realty Development, LLC; Peter Cocoziello; Rothschild Realty, Inc.; Rothschild Realty Managers LLC n/k/a Almanac Realty Investors, LLC; Five Arrows Realty Securities, III, LLC n/k/a/ Almanac Realty Securities III, LLC (ARS); John D. McGurk; D. Pike Aloian; Patricia K. Sheridan; John Does 1-50; and Jane Does 1-50.

connection with the October Indenture. Metrogate did not resume making payments but, despite assertions to the contrary by the Petitioning Creditors, has not admitted to default under the Indentures.

On August 16, 2013, Funds II, IV, and VI (acting through their collateral manager or attorney-in-fact TP Management, specifically Mr. Morgan McClure) filed a complaint against Metrogate and the NY State Action Defendants (the "2013 Complaint") in the Supreme Court of the State of New York, County of New York (the "NY Court" and the "NY State Action," Index No. 652884/2013). The NY State Action asserted 12 causes of action, including breach of the October Indenture.[7] On October 3, 2014, the NY Court issued a decision on Metrogate's motion, dismissing all but four causes of action (the "2014 Dismissal Order"). In the 2014 Dismissal Order, the NY Court dismissed all of the claims except for: (1) breach of indenture; (4) actual fraudulent conveyance; (5) constructive fraudulent conveyance; and (6) unjust enrichment.[8] The NY Court also found that the funds lacked standing to sue for breach of the Subordination Agreement, and that the 2013 Complaint failed to state a cause of action for both the breach of the Subordination Agreement and a breach of the covenant of good faith and fair dealing with regard to the Subordination Agreement (noting that the Funds could not revive their nonviable breach of contract claim by casting it as a good faith violation). On November 4, 2014, Funds II, IV, and VI appealed the 2014 Dismissal Order. (McGurk Decl. ¶ 14, D.I. 16 Ex. A, at 5.) On

---

[7] (1) breach of indenture; (2) breach of subordination agreement; (3) breach of the covenant of good faith and fair dealing under indenture and subordination agreement; (4) actual fraudulent conveyance under N.Y. DCL §§ 270-81; (5) constructive fraudulent conveyance under NY DCL §§ 270-281; (6) unjust enrichment; (7) constructive trust; (8) accounting; (9) fraudulent concealment; (10) aiding and abetting fraud (later withdrawn); (11) conspiracy to commit fraud; and (12) piercing the corporate veil and declaratory judgment on alter ego. Metrogate Ex. 31, at ¶¶ 159-253, D.I. 47-4, at 113-125.

[8] *Taberna Preferred Funding II, Ltd. v. Advance Realty Group LLC*, 45 Misc.3d 1204(A), at *14 (N.Y. Sup. Ct. Oct. 3, 2014), D.I. 16 Ex. G, at 36.

November 13, 2014, Metrogate filed a cross-appeal. (*Id.*) TP Management took over collateral

management services for Fund I on December 1, 2014. (McClure Decl. ¶ 6, D.I. 21, at 2.)

On April 10, 2015, the Funds sought leave to file a first amended complaint in the NY

State Action to (1) address perceived deficiencies in the original complaint identified in the 2014

Dismissal Order, including adding the trustee Computershare to obtain standing and assert

claims under the Subordination Agreements and breach of the covenant of good faith and fair

dealing; (2) add claims on behalf of Fund I; (3) amend claims based on new information "gained

in discovery" about "insider funding vehicles" ADV/F and ADCAP Funding LLC. (Metrogate

Ex. 9, at 3, D.I. 16 Ex. H, at 7.) The motion to amend was denied (in part) by decision and order

dated October 23, 2015, which allowed amendment of one count of breach of contract for Fund I

(the "2015 Leave to Amend Order"). Because of the expired statute of limitations with regard to

the 2008 Conversion Agreement, Fund I was only granted leave to join Count One for breach of

the Indentures. (Metrogate Ex. 9, at 14, D.I. 16 Ex. H, at 18.)

The NY Court denied leave to amend the Subordination Agreement counts on the merits,

despite holding that TP Management cured its standing defect by adding Computershare.

(Metrogate Ex. 9, at 4, D.I. 16 Ex. H, at 8.) The NY Court did not allow the amendment to relate

back with regard to Fund I joining the causes of action for fraudulent conveyance or unjust

enrichment because TCM's non-participation before the statute of limitations expired in October

2014 did not constitute a mistake that would allow the causes of action for actual and

constructive fraudulent conveyance and unjust enrichment asserted by TP Management for

Fund I to relate back to the 2013 Complaint: "At the time, Fund I had a different collateral

manager who, for whatever reason, chose not to file suit against defendants. Nothing in the

record suggests its decision not to sue defendants was a mistake."[9] (Metrogate Ex. 9, at 12, D.I. 16 Ex. H, at 16.)

To summarize NY State Action to this point: (1) the causes of action for all of the Funds pertaining to, *inter alia*, piercing the corporate veil and the Subordination Agreements are dismissed; and (2) all causes of action for Fund I related to the 2008 Conversion Agreement, including counts for actual and constructive fraudulent conveyance and unjust enrichment, were barred by New York's six-year statute of limitations, with only the question of default under the Indentures outstanding.

On November 5, 2015, the Funds filed the First Amended Complaint. (the "First Am. Compl.," Metrogate Ex. 10, D.I. 16 Ex. I.) Soon after the 2015 Leave to Amend Order was issued, the NY Court suggested the parties meet to discuss a settlement. (McGurk Test. 78:6-22, D.I. 64.) Mr. McClure requested additional documents from Mr. McGurk, which he received. (*Id.*) On December 11, 2015, Metrogate filed their answer with affirmative defenses and counterclaims. (Metrogate Ex. 11, D.I. 16 Ex. J.) Eleven days later, at the direction of Mr. McClure, TP Management filed the Involuntary Petition. (D.I. 1.)

Appeals of the 2014 Dismissal Order and the 2015 Leave to Amend Order are pending before the Appellate Division of the New York State Supreme Court, First Judicial Department.

### The Counterclaims

On December 11, 2015, Metrogate (together with its co-defendants) filed answers and defenses to the Amended Complaint, and also asserted counterclaims (the "Answer and

---

[9] The Petitioning Creditors' motion for leave to amend to assert actual and constructive fraudulent conveyance and unjust enrichment claims with relation to Fund I was also denied because the amendments would "require increasing the original complaint's ad damnum clause." Metrogate Ex. 9, at 12, D.I. 16 Ex. H, at 16. The Funds also added a cause of action for tortious interference against ADV/F and ADCAP, which the NY Court split into two claims, one for tortious interference with contract and another for tortious interference with business relations, rejecting both. Metrogate Ex. 9, at 12-13, D.I. 16 Ex. H, at 16-17.

Counterclaims"). (Metrogate Ex. 11, D.I. 16 Ex. J.) The Counterclaims assert claims for tortious interference with business relationships and breach of the implied covenant of good faith and fair dealing in connection with negotiations to restructure the preferred securities. The counterclaims mirror conduct that resulted in a September 15, 2015, Order Instituting Settled Administrative Proceedings issued by the SEC (the "SEC Order"). (Metrogate Ex. 13.) The SEC Order found that in connection with the restructuring of some of Taberna's debt after the global financial crisis, TCM violated the Securities Exchange Act of 1934 and Investment Advisors Act of 1940 by seeking to negotiate certain fees as a condition to the restructuring negotiation. The SEC Order required TCM to (a) cease and desist from committing the violations identified and (b) pay the SEC disgorgement of $13 million, prejudgment interest of $2 million, and a civil penalty of $6.5 million. Based on the Answer and Counterclaims, Metrogate disputes *any* liability to the Funds under the Indentures and Notes and seeks the following relief in the NY State Action: (1) dismissal of the First Amended Complaint with no recovery for the Funds; and (2) judgment awarding Metrogate and its co-defendants damages of $60 million, plus interest.[10]

<u>Discovery in the NY State Action—The ADV/F Loans</u>

Allegedly as a result of discovery in the NY State Action, TP Management discovered that Metrogate had failed to disclose that it was transferring assets, including the placement of insider loans. On December 10, 2015, after the Funds' discovery requests had been made in the NY State Action, Mr. McGurk produced documents (including the "FARS Investment Memorandum") allegedly showing that Metrogate's subsidiaries had been paying interest on

---

[10] Although Metrogate refers to TCM (Taberna Capital Management) as the predecessor to TP Management, TP Management states that it is not affiliated in any way with TCM. TP Management asserts that it and TCM are separate entities with no common ownership and the only connection that the Funds argue is relevant to this proceeding is that TP Management purchased collateral rights from TCM following arm's-length negotiations. TP Management took over collateral management services for Funds II, IV, and VI on April 21, 2010. TP Management took over collateral management services for Fund I on December 1, 2014. TP Management is controlled by FIG (Fortress Investment Group, employer of Morgan McClure), TCM by RAIT Financial Trust.

insider loans. TP Management alleges that revenue from Metrogate's property assets was being redirected to ADV/F Funding (and therefore to FARS and Cocoziello) through loans originated expressly for the purpose of circumventing the Funds' collection of the debt owed by Metrogate. TP Management characterized the loans as "egregious" (primarily due to the use of "equity kickers"). TP Management also alleges that FARS (through Mr. McGurk and Mr. Aloian) intended to hinder the Funds' recovery of principal by "siphoning money out of Metrogate's assets every day." On December 22, 2015, twelve days after Mr. McGurk produced the ADV/F documents, TP Management filed the Involuntary Petition for the Funds.

## JURISDICTION

This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). The determination of whether an order for relief should be granted in an involuntary case is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A) & (O).

## APPLICABLE LAW

Section 303 provides, in relevant part:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> > (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability of the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims . . . .

11 U.S.C. § 303.

Section 6.10(b) of the Trust Agreements (Metrogate Ex. 2, D.I. 16 Ex. A, at 41; Metrogate Ex. 5, D.I. 16 Ex. D, at 41) states:

> For so long as any Preferred Securities remain Outstanding, to the fullest extent permitted by law and subject to the terms of this Trust Agreement and the

Indenture, upon a Note Event of Default specified in paragraph (a) or (b) of Section 5.1 of the Indenture, any Holder of Preferred Securities shall have the right to institute a proceeding directly against the Depositor, pursuant to Section 5.8 of the Indenture, for enforcement of payment to such Holder of any amounts payable in respect of Notes having an aggregate principal amount equal to the aggregate Liquidation Amount of the Preferred Securities of such Holder. Except as set forth in Section 6.10(a) and this Section 6.10(b), the Holders of Preferred Securities shall have no right to exercise directly any right or remedy available to the holders of, or in respect of, the Notes.

Section 5.8 of the Indentures (Metrogate Ex. 3, D.I. 16 Ex. B, at 40; Metrogate Ex. 6, D.I.

16 Ex. E, at 41) states:

Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and any premium on such Security at its Maturity and payment of interest (including any Additional Interest) on such Security when due and payable and, to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Any registered holder of the Preferred Securities shall have the right, upon the occurrence of an Event of Default described in Section 5.1(a) or Section 5.1(b), to institute a suit directly against the Company for enforcement of payment to such holder of principal of and any premium and interest (including any Additional Interest) on the Securities having a principal amount equal to the aggregate Liquidation Amount of the Preferred Securities held by such holder.

## ANALYSIS

### A. <u>Statutory Requirements of § 303 – Numerosity – The Holder of a Claim</u>

The term "claim" is defined by the Bankruptcy Code as a "right to payment" of

practically any type: "whether or not such right is reduced to judgment, liquidated, unliquidated,

fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured . . . ." 11 U.S.C. § 101(5). Here, there are four funds, three with separately enforceable

claims of varying amounts on a single note in the original principal amount of $35 million

(Funds II, IV, VI), and another fund with a claim on a second note in the amount of $25 million

(Fund I), but only one collateral manager/attorney-in-fact and one trustee among them.

Metrogate argues that the two notes constitute only two claims (Metrogate MTD ¶ 22, D.I. 16,

at 9); the Petitioning Creditors respond that each Fund holds a separate claim (PC Mem. 25, D.I. 20, at 30).

In *In re Mid-America Indus., Inc.* (urged by the Petitioning Creditors),[11] three trust funds were found to be separate for the purposes of § 303 despite having merged collection activities. However, unlike here, each of the trust funds had its own separate board of trustees providing independent guidance.[12] The reasoning of *In re Richard Turner Co., Inc.* is more persuasive, dealing with a single collective bargaining agreement that created three independent payment obligations.[13] However, the CBA differed from the notes here in that it contained "three separate provisions creating separate obligations."[14] *In re Tichy Elec. Co.* is the closest parallel, in which three substantially interrelated funds with identical interests and overlapping or identical trustees were found to be separate for the purposes of § 303 numerosity.[15] The *Tichy Electric* court felt its conclusion was compelled by the results in *In re Mid-America Indus., Inc.* and *In re Richard Turner Co., Inc.*, but expressed misgivings because of the underlying bankruptcy policy that, "The purpose of requiring at least three creditors to launch an involuntary case . . . is to necessitate some joint effort between creditors."[16] That consideration, together with the fact that the funds' sole purpose in filing the Involuntary Petition was "to collect delinquent contributions from Tichy Electric," led the court to a conclusion of bad faith and dismissal of the involuntary petition.[17] Other courts speak disapprovingly of any "quasi-two-party-dispute."[18]

---

[11] 236 B.R. 640, 642, 646 (Bankr. N.D. Ill. 1999).
[12] *See id.* at 642.
[13] 209 B.R. 177, 179 (Bankr. D. Mass. 1997).
[14] *Id.*
[15] 332 B.R. 364, 375 (Bankr. N.D. Iowa 2005).
[16] *Id.* at 372 (quoting *In re Iowa Coal Min. Co., Inc.*, 242 B.R. 661, 670 (Bankr. S.D. Iowa 1999)).
[17] *See id.* at 375-77.
[18] *See In re WLB-RSK Venture*, 296 B.R. 509, 515 (Bankr. C.D. Cal. 2003).

Metrogate urges comparison with *In re Averil, Inc.*, in which two joint holders of a note were considered one party under § 303.[19] However, the note in *Averil* did not provide for separate enforcement to the extent of each party's holdings; instead the parties owned an "undivided interest in the notes . . . ."[20] *In re T.P. Herndon & Co.*, also advanced by Metrogate, similarly dealt with "undivided interests."[21]

The crucial distinction here is whether an alleged claim is separately enforceable. If a single judgment or a single note can be divided into three or more rights of payment, each held by a separate entity and separately enforceable, the numerosity requirement is met. Under the relevant sections of the Trust Agreements and the Indentures, upon the event of a default, an individual Preferred Securities holder can pursue suit independently, but only up to the amount of its individual holdings.

In *In re Zapas*, relied upon heavily by the Petitioning Creditors, four creditors holding a single default judgment based upon an oral contract were considered separate for the purposes of numerosity.[22] The *Zapas* court stated:

> while the judgment lists [the four Petitioning Creditors] in the conjunctive and did not provide that each would receive separate awards but rather issued an undivided judgment for $656,683.15, nothing under New York law, to the Court's knowledge, prevents each party from enforcing or executing on the judgment without the joinder of the others.[23]

But I do not find *Zapas* pertinent to the case at hand, as each fund here can separately pursue its own suit to the extent of its Preferred Security holdings.

---

[19] 33 B.R. 562, 563 (Bankr. S.D. Fla. 1983).
[20] *Id.*
[21] 87 B.R. 204, 205 (Bankr. M.D. Fla. 1988).
[22] 530 B.R. 560, 569 (Bankr. E.D.N.Y. 2015).
[23] *Id.* at 571.

Metrogate protests that there is a legitimate dispute whether *any* of the Petitioning Creditors, individually, can enforce the terms of the notes, citing a pending appeal in the NY State Action specifically related to this issue. (Metrogate MTD ¶ 22 n.4, D.I. 16, at 9.) The definition of "claim" in 11 U.S.C. § 101 is intentionally broad. Under these facts and under the relevant provisions of the Trust Agreements and Indentures, a holder of a Preferred Security has a claim: each Fund is a separate entity holding Preferred Securities with the ability to sue separately for enforcement; recovery need not be sought jointly and would not be duplicative. Therefore, I conclude that the Petitioning Creditors meet the numerosity requirement of 11 U.S.C. § 303.

### B. Statutory Requirements of § 303 – No Bona Fide Dispute

The § 303 claims cannot be "contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1). The Petitioning Creditors must now meet their burden of establishing a prima facie case that the amounts claimed under the Indentures are free of any "objective basis for either a factual or a legal dispute as to the validity of the debt."[24] Once a prima facie case has been established, the burden shifts to the alleged debtor to show that the dispute is indeed bona fide.[25] In *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Ctrs., Inc.* ("*Busy Beaver*"), the Third Circuit held that: "If there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed."[26] "Substantial" factual and legal questions preclude a finding of involuntary bankruptcy.[27] The court's objective is to "ascertain the existence of a

---

[24] *In re AMC Inv'rs.*, 406 B.R. 478, 483-84 (Bankr. D. Del. 2009); 2 COLLIER ON BANKRUPTCY ¶ 303.11[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).
[25] *In re AMC Inv'rs.*, 406 B.R. at 484.
[26] *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66 (3d Cir. 1989).
[27] *See id.* at 66-67.

dispute, not to actually resolve the dispute."[28] The existence of affirmative defenses may suggest that bona fide disputes exist.[29] Pending litigation strongly suggests, but does not necessarily establish, the existence of a bona fide dispute.[30]

To say that there are no bona fide disputes involved here would be extraordinary, as the same transactions that are the subject of this action are the subject of the NY State Action that has been litigated energetically since August 2013. The Petitioning Creditors' claims for breach of contract based on the alleged default of the securities are central to that litigation.[31] In that action, there have been several decisions, subject to ongoing appeals, that dismissed roughly half of the Petitioning Creditors' claims and upheld the other half,[32] and discovery consisting of the production of more than 500,000 documents. (2/22/16 Tr. 19:9-13, D.I. 64.) Eleven days before the filing of the Involuntary Petition, Metrogate filed an answer with twenty-six separate defenses and two counterclaims. (Answer and Counterclaims, Metrogate Ex. 11, D.I. 16 Ex. J.) Briefing is ongoing in the NY Court.

The Petitioning Creditors assert that Metrogate "has readily admitted that it is in default under the Indentures." (PC Mem. 26-27, D.I. 20, at 31-32.) Metrogate disagrees: "In fact,

---

[28] *In re AMC Inv'rs.*, 406 B.R. at 484.

[29] *See In re Zapas*, 530 B.R. 560, 567 (Bankr. E.D.N.Y. 2015); *Liberty Tool v. Vortex Fishing Sys. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1067 (9th Cir. 2001).

[30] *In re TPG Troy, LLC*, 429 B.R. 150, 159 (Bankr. S.D.N.Y. 2013) (collecting cases), *aff'd sub nom. Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228 (2d Cir. 2015).

[31] Count One in the 2013 Complaint is "BREACH OF INDENTURES" related to Funds II, IV, and VI. Metrogate Ex. 31, ¶¶ 159-167, D.I. 47-4, at 113. "Debtor is in breach of the Indenture by, among others, failing to cure the 'Events of Default' as defined in Section 5.1 of the Indenture." *Id.* ¶ 162. The New York State Supreme Court denied Metrogate's motion to dismiss Count One. *Taberna Preferred Funding II, Ltd. v. Advance Realty Group LLC*, 45 Misc.3d 1204(A), at *16 (N.Y. Sup. Ct. Oct. 3, 2014), Metrogate Ex. 8, at 32, D.I. 16 Ex. G, at 36. Fund I was later properly added to Count One, as recognized in the 2015 Leave to Amend Order. Metrogate Ex. 9, at 7, D.I. 16 Ex. H, at 11.

[32] Among the Petitioning Creditors' claims that survived the 2014 Dismissal Order and more recent 2015 Leave to Amend Order are breach of contract, actual and constructive fraudulent conveyance, and unjust enrichment with relation to Funds II, IV, and VI, and breach of contract with relation to Fund I. *Taberna II v. ARG*, 45 Misc.3d 1204(A), at *16; 2015 Leave to Amend Order, Metrogate Ex. 9, at 14, D.I. 16 Ex. H, at 18. The dismissed counts included, *inter alia*, claims relating to veil piercing, constructive trusts, and breach of the Subordination Agreements; Fund I was dismissed from all fraudulent conveyance and unjust enrichment counts as barred by the six-year New York State statute of limitations. *Id.*

Metrogate has never conceded that it is in default under the Indentures." (Metrogate Reply & Obj. ¶ 24, D.I. 47, at 12.) The Petitioning Creditors have based their contention that Metrogate has "readily admitted" default on (1) a single question and answer from a deposition given by board member Peter J. Cocoziello at some point in the Delaware Chancery Court case;[33] (2) that default was acknowledged in Note 3 of several years of Metrogate's financial statements, statements which, upon review, differentiate—in an arguably nuanced way—between "in default" and "currently not in compliance with the terms of," but never once acknowledging that the Indentures are "in default";[34] and (3) admissions of nonpayment, though Metrogate states that senior debt owed to Forge Funding must be paid ahead of the Indentures, it does not characterize this as default.[35] The Petitioning Creditors urge this Court to consider *In re CorrLine Int'l, LLC*, for the proposition that disputes in general, and counterclaims in particular, do not necessarily constitute bona fide disputes.[36] Even without challenging that assertion, the Petitioning Creditors still bear the burden to establish a prima facie case that no bona fide dispute exists. Moreover, with regard to the same excerpt of Mr. Cocoziello's deposition, the Petitioning Creditors state, "[Metrogate] 'intentionally' and 'tactically' defaulted on the Petitioning Creditors' debt," (PC Mem. 27, D.I. 20, at 32) when the excerpt does not include the words "intentionally" or "tactically," and in fact reflects Mr. Cocoziello's denial of the assertion that default was used as a negotiation tactic.[37]

---

[33]    Q: And the company has been in default of its Taberna obligations since August of 2009, correct?
         A: Yes
D.I. 22-23 Ex. W 128:18-21, at 2.

[34] PC Ex. 20, at 13; PC Ex. 21, at 13. The Petitioning Creditors here rely on Note 3 in the financial statements, but argue that the loan terms contained in Note 16 of the same financial statements were not disclosed or "buried." 2/23/16 Tr. 36:4-37:1, D.I. 68 ("McClure Test.").

[35] McGurk Decl. ¶ 27, D.I. 16 Ex. A, at 9-10.

[36] 516 B.R. 106, 150 (Bankr. S.D. Tex. 2014).

[37]    Q: Now, did the board cause ARG to purposely default on Taberna as a negotiating tactic?
         A: No, I think the purpose was that we—[excerpt ends here]
D.I. 20 Ex. W 128:22-24.

The Petitioning Creditors make much of the timing of the filing of Metrogate's Answer and Counterclaims, seeming to imply they were filed as a litigation tactic to forestall this very involuntary action before Metrogate ever knew of it.[38] To buttress this implication, the Petitioning Creditors note that the counterclaims were not mentioned in earlier filings. (2/29/16 Tr. 55:21-56:14, D.I. 81 ("PC Closing Arg.").) This line of argument is unavailing for several reasons, among them: the basis for the counterclaims, an SEC order against former collateral manager TCM, did not arise until September 2015—one would need to be trapped in a time warp to find it mentioned in 2014; the Petitioning Creditors have not alleged, here or in the NY State Action, that the answer with affirmative defenses and counterclaims was procedurally improper, so the timing with regard to Metrogate is entirely immaterial; the Petitioning Creditors filed their own detailed answer to the counterclaims and affirmative defenses after filing the Involuntary Petition (PC Ex. 12, D.I. 16 Ex. K); and, despite urging this Court to find both counterclaims to be without merit, the Petitioning Creditors have filed a motion to dismiss only the first of the two counterclaims in the NY State Action.[39]

As any intrusion into the NY State Action is unwarranted, I decline to address counterclaim one. However, the Petitioning Creditors have failed to carry their burden of establishing a prima facie case that counterclaim two does not reflect the existence of a bona fide dispute.

Two brief preliminary matters. First, the nearest the Petitioning Creditors come to addressing Metrogate's counterclaim directly is by repeatedly stating that it was not TP Management's *policy* to require improper administrative fees. (McClure Test. 15:25-16:4,

---

[38] "two recently and conveniently filed counterclaims in the NY Court." PC Mem. 28, D.I. 20, at 33.
[39] This Court takes judicial notice of recent activity in the NY State Action: Notice of Mot. to Dismiss, No. 652884/2013 (N.Y. Sup. Ct. Feb. 29, 2016), Doc. No. 176; Mem. Of Law in Supp. of Mot. to Dismiss, Doc. No. 177.

D.I. 68; PC Closing Arg. 58:24-59:1, D.I. 81.) This is not sufficient to quell a bona fide dispute, and this issue may, in relation to the counterclaim, constitute a bona fide dispute by itself.

Second, the Petitioning Creditors urge that I apply the pre-Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")[40] interpretation of § 303. Under the pre-BAPCPA interpretation of § 303, "if at least a portion of the debt is undisputed, the undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject to a bona fide dispute."[41] In *Busy Beaver*, a pre-BAPCPA decision, the Court of Appeals for the Third Circuit adopted the Court of Appeals for the Seventh Circuit's formulation that substantial factual and legal questions raised by the debtor preclude a finding of involuntary bankruptcy.[42]

Since the BAPCPA addition to § 303 of "as to liability or amount," the "majority of courts have concluded that the 2005 amendment changed the analysis such that now *any* dispute as to amount (whether implicating the statutory threshold or not) renders a creditor ineligible."[43] Yet courts and treatises have expressed widely varying views on the so-called all-or-nothing analysis.[44] In the NY State Action, Metrogate requests relief in the form of dismissal of the First Amended Complaint and damages of not less than $60 million (Answer & Counterclaims 48-49, D.I. 16 Ex. J, at 49-50). As the relief requested encompasses the entire alleged debt, intrusion

---

[40] Pub. L. No. 109-8, 119 Stat. 23.

[41] *In re Onyx, Ltd.*, 60 B.R. 492, 497 (Bankr. S.D.N.Y. 1985).

[42] *B.D.W. Assoc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989) (citing *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)).

[43] *Farmers & Merchants State Bank v. Turner*, 518 B.R. 642, 651-54 (N.D. Fla. 2014).

[44] *See* 2 COLLIER ON BANKRUPTCY ¶ 303.11[2]. *Compare In re DemirCo Holdings, Inc.*, 2006 Bankr. LEXIS 1131, at *8 (Bankr. C.D. Ill. June 9, 2006) (holding that "for a bona fide dispute to be relevant it must "at least have the potential to reduce the total of petitioner's claims to an amount below the statutory threshold," citing a pre-BAPCPA 9th Circuit decision where certiorari was denied mere days before BAPCPA passed: *Focus Media, Inc. v. NBC (In re Focus Media, Inc.)*, 378 F.3d 916, 926 (9th Cir. 2004), *cert. denied* 544 U.S. 968 (2005)), *and Wishgard, LLC v. Southeast Land Servs., LLC (In re Wishgard, LLC)*, 2013 Bankr. LEXIS 1702, at *13-14 (Bankr. W.D. Pa. Apr. 23, 2013) (substantially agreeing with this interpretation in dictum), *with Riverview Trenton R.R. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 947 (6th Cir. 2007) (quoting *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986), and holding that Congress made clear that it "intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal"), *and Fustolo v. 50 Thomas Patton Drive, LLC*, 816 F.3d 1, 10 (1st Cir. 2016) (holding that there is no materiality requirement in § 303).

into what the NY Court may decide as the appropriate relief is unwarranted.[45] Even if the relief requested by Metrogate did not encompass the entire alleged debt, the disputes between these parties are "substantial."[46] Though it does not directly define what relative percentage of amount or liability must be called into question, *Busy Beaver* is still good law.

Counterclaim two alleges a breach of the covenant of good faith and fair dealing under New York law. (Answer and Counterclaims ¶¶ 34-41, D.I. 16 Ex. J, at 48-49.) The factual allegations relate to an SEC Order that imposed a substantial fine upon former-collateral manager TCM for requiring improper exchange fees in connection with restructuring certain CDOs after the 2008 financial crisis. (Answer and Counterclaims ¶ 26, D.I. 16 Ex. J, at 42.) Metrogate alleges that, while in negotiations to restructure the Indentures, *both* TCM *and* TP Management subjected it to similar mistreatment by requesting exorbitant and improper administrative fees. (Answer and Counterclaims ¶¶ 18-24, 36, D.I. 16 Ex. J., at 41-42, 48.) Therefore, Metrogate reasons, "the Funds, *through* TCM and TPM, deprived [Metrogate] of [the benefit of] certain provisions . . . which interfered with [Metrogate]'s ability to restructure and exchange the securities in fairness and in good faith." (*Id.* (emphasis added).) Metrogate requests from the NY Court dismissal of the Amended Complaint, and damages to be determined at trial of not less than $60 million. (Answer and Counterclaims 48-49, D.I. Ex. J., at 49-50.)

The Petitioning Creditors have repeatedly argued that the second counterclaim refers only to the CDO Indentures and that Metrogate has no standing to bring the claim because it is not a party to the CDO Indentures. (PC Closing Arg. 56:15-20, D.I. 81.)[47] The Petitioning Creditors

---

[45] As is speculation as to what the Third Circuit's position may eventually be on the "all-or-nothing" issue.
[46] *Busy Beaver*, 865 F.2d at 66-67.
[47] *See also* PC Mem. 29-31, D.I. 20, at 34-36; PC Reply 7-10, D.I. 55, at 9-12; Metrogate Ex. 12, ¶¶ 34-42, D.I. 16-13, at 12-15.

have also argued repeatedly that Metrogate's counterclaim alleges merely a failure to negotiate a compromise settlement.[48] (PC Closing Arg. 57:15-21, D.I. 81.)

Metrogate responds that the second counterclaim *does* refer to the Indentures, to which Metrogate is a party, and that the Petitioning Creditors are distorting its position. (PC Reply & Obj. ¶ 28, D.I. 47, at 14; 2/29/16 Tr. 76:3-11, D.I. 81 ("Metrogate Closing Arg.").) The Petitioning Creditors state that: "'CDO Indentures' was also a defined term in [the] First Amended Complaint in the NY Court, and ARG manifestly uses the term 'CDO Indentures' as the indentures issued by the Funds to their own investors, not the 'Indentures.'" (PC Reply 8, D.I. 55, at 10.) The Petitioning Creditors refer to a footnote in the First Amended Complaint defining "CDO Indentures": "(B) the Indentures, dated March 15, 2005, December 23, 2005, June 28, 2005, and June 27, 2006 (the '*CDO Indentures*')." (First Am. Compl. 2 n.2, D.I. 16 Ex. I, at 3.) On the following page the Petitioning Creditors defined "Indentures":

> The Funds are owed more than $60 million by ARG, which has defaulted under: (A) the Junior Subordinated Indenture, dated March 15, 2005, between ARG and JPMorgan Chase Bank, National Association (the "*March Indenture*"); and (B) the Junior Subordinated Indenture, dated October 14, 2005, between ARG and JPMorgan Chase Bank, National Association (the "*October Indenture*," together with the March Indenture, the "*Indentures*").

(First Am. Compl. ¶ 2, D.I. Ex I., at 4.) Metrogate argues that the Petitioning Creditors' characterization of Metrogate's counterclaim is "not correct and they know it." (Metrogate Closing Arg. 76:7-8, D.I. 81.) I agree. By mischaracterizing Metrogate's counterclaim, the Petitioning Creditors fail to accurately and adequately address it.

In counterclaim two, Metrogate refers to the "CDO Indentures" separately from "the Indenture" when distinguishing between collateral managers TP Management and TCM's obligations to the Funds and the Funds' obligations to Metrogate. (Answer and Counterclaims

---

[48] *See also id.*

¶¶ 37-38, D.I. Ex. J, at 48-49.) There is no doubt as to which agreements Metrogate is referring, and, if there were, it was clarified by Metrogate's explanation in its Reply and Objection.

The Petitioning Creditors characterize counterclaim two as "premised on a purported duty to negotiate after a default . . . ." (PC Mem. 29, D.I. 20, at 34.) The Metrogate Reply and Obj. clarifies that the counterclaim does not allege that the Petitioning Creditors had a duty to renegotiate their claims after a default. "Rather, the counterclaim alleges that in exercising their discretion to accept or reject an exchange, they were bound by the implied covenant of good faith and fair dealing, which they breached." (PC Reply & Obj. ¶ 29, D.I. 47, at 14-15.) The Petitioning Creditors consistently failed to address Metrogate's actual argument, repeating that: "no lender has a duty or obligation to negotiate a compromise or settlement." (PC Closing Arg. 57:19-20, D.I. 81.) Metrogate's counterclaim, however, relies on the truism that, even if one has no obligation to negotiate, if one chooses to, they must do so in good faith.[49] The Petitioning Creditors have failed to establish a prima facie case that no bona fide dispute exists. Therefore, the § 303 statutory requirements have not been met.

On the record before me, I conclude that there are substantial factual and legal questions here that constitute bona fide disputes under 11 U.S.C. § 303.

### C. Bad Faith under § 303 and *Forever Green*

Metrogate also asserts that the Involuntary Petition was filed in bad faith and seeks damages, fees, and costs under 11 U.S.C. § 303(i).

**Applicable Law**

In *In re Forever Green Ath. Fields, Inc.*, the Third Circuit held that "bad faith provides an independent basis for dismissing an involuntary petition."[50] Creditors who file petitions "as a

---

[49] *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994).
[50] 804 F.3d 328 (3d Cir. 2015).

litigation tactic in pending proceedings" act in bad faith.[51] The inquiry into bad faith is "a fact

intensive determination better left to the discretion of the bankruptcy court."[52] Creditors are

presumed to have acted in good faith; to dismiss the petition, the alleged debtor "must show by a

preponderance of the evidence that the creditors acted in bad faith."[53] The standard for bad faith

under 11 U.S.C. § 303 is the "totality of the circumstances," looking to "both subjective and

objective evidence of bad faith."[54] The Third Circuit provided a non-exhaustive list of factors

courts may consider whether:

> [1] the creditors satisfied the statutory criteria for filing the petition; [2] the
> involuntary petition was meritorious; [3] the creditors made a reasonable inquiry
> into the relevant facts and pertinent law before filing; [4] there was evidence of
> preferential payments to certain creditors or of dissipation of the debtor's assets; [5]
> the filing was motivated by ill will or a desire to harass; [6] the petitioning creditors
> used the filing to obtain a disproportionate advantage for themselves rather than to
> protect against other creditors doing the same; [7] the filing was used as a tactical
> advantage in pending actions; [8] the filing was used as a substitute for customary
> debt-collection procedures; and [9] the filing had suspicious timing.[55]

Substantial case law prior to *Forever Green* focused on the nexus between the seventh

(litigation tactic) and ninth (timing) factors, inquiring into whether the action was brought with a

"valid bankruptcy purpose" such as "preserving a going concern or maximizing the values of the

Debtors' estate."[56] In several cases, bad faith was found solely from a joint analysis of "valid

bankruptcy purpose" and suspicious timing of filing in *voluntary* petitions:

> As a general rule, where, as here, the timing of the filing of a Chapter 11 petition is
> such that there can be no doubt that the primary, if not sole, purpose of the filing

---

[51] *See id.* at 334.

[52] *Id.* at 335 (internal citations omitted).

[53] *Id.* (internal citations omitted).

[54] *Id.* at 336 (citing *Adell v. John Richards Home Bldg. Co., L.L.C. (In re John Richards Home Bldg. Co., L.L.C.)*,
439 F.3d 248, 255 n.2 (6th Cir. 2006)).

[55] *Id.*

[56] *In re 15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 619 (3d Cir. 2009).

was a litigation tactic, the petition may be dismissed as not being filed in good faith.[57]

Forum shopping is an archetypical bad faith litigation tactic.[58]

I consider the following factors relevant here.

### The Statutory Criteria for Filing the Petition

**a.** Numerosity

Although numerosity is a statutory requirement, it has an equitable component as well. The numerosity requirement is based "on strong policy considerations, which include the fear that one or two recalcitrant creditors might file an involuntary case to harass a debtor."[59] As noted above, all four Funds now have one collateral manager, TP Management. Morgan McClure, its authorized signatory, has stated that he unilaterally made the decisions to bring both the 2013 NY State Action and the present involuntary action. (2/23/16 Tr. 22:8-23:15, D.I. 68 ("McClure Test.").) Mr. McClure apparently was the principal decision maker as to whether Metrogate could renegotiate the Indentures as to Funds II, IV, and VI (Fund I was held by TCM until December 2014) and constituted a blocking vote. All negotiations between Metrogate and the Funds with regard to this and the NY State Action have been solely with Mr. McClure. Mr. McClure made no effort whatsoever to seek out other creditors to join the Involuntary Petition. (*Id.*) Upon urging by the judge in the NY State Action to hold settlement talks following the denial of a substantial number of the Petitioning Creditors' claims, Mr. McClure did not engage

---

[57] *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999) (quoting *In re HBA East, Inc.*, 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988)); *see also In re 15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605 (3d Cir. 2009) (finding the timing of filing dispositive in a ruling of bad faith where Debtors filed Chapter 11 petition to avoid liability in another action); *cf. Crown Vill. Farm, LLC v. ARL, L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86 (Bankr. D. Del. 2009) (finding that while "timing is a key element," in that instance the "bankruptcy filing was independent of and not in response to the *State Court Actions*").

[58] *See In re Silberkraus*, 253 B.R. 890, 905-07 (Bankr. C.D. Cal. 2000).

[59] 2 COLLIER ON BANKRUPTCY ¶ 303.14[2].

in those talks but rather requested additional documents from Mr. McGurk and subsequently filed the Involuntary Petition. (2/22/16 Tr. 78:3-79:3, D.I. 64 ("McGurk Test.").) The four Funds have one trustee, now Computershare, which agreed to join the NY State Action to cure a standing problem addressed in the NY State Action's motion to dismiss (the effect of its participation is now under appeal) but, though Computershare filed a statement opposing the Metrogate MTD, it did not actually join the Involuntary Petition.[60]

Although the Petitioning Creditors met the statutory numerosity requirement, the dispute appears to be functionally between two parties. Additionally, there appears to be a single recalcitrant creditor who is more concerned with a collection action than with the alleged debtor's well-being as a going concern. Having several independently represented creditors increases the likelihood of productive discussions, leading to settlements. There appears to be little possibility of that in this instance. Although I do not fault a litigant for the aggressive pursuit of its legal rights, the relationship between the collateral manager/attorney-in-fact TP Management, the sole negotiator on behalf of the Funds (Mr. McClure), and Metrogate, appears similar to what Collier warns of—the recalcitrant creditor.[61]

      b.  No Bona Fide Dispute as to Amount or Liability

As detailed *supra*, Section B, I found that the Petitioning Creditors did not meet the statutory requirements of § 303.

---

[60] Statement of Computershare Trust Co. in Opp'n to Alleged Debtor Metrogate, LLC's Mot. to Dismiss Involuntary Pet. and Req. for Award of Damages, Fees and Costs for Bad Faith Filing, D.I. 54.

[61] "[The numerosity] requirements are based on strong policy considerations, which include the fear that one or two recalcitrant creditors might file an involuntary case to harass a debtor." 2 COLLIER ON BANKRUPTCY ¶ 303.14[2] (citing *In re Tichy Elec. Co.*, 332 B.R. 364, 377 (Bankr. N.D. Iowa 2005)).

Was the Involuntary Petition Meritorious?

The Petitioning Creditors argue that the 2008 Conversion Agreement was secretly constructed, and "caused ARG to enter into numerous avoidable transfers, all while ARG was insolvent or which rendered it so." (PC Mem. 1, D.I. 20, at 6.) The Petitioning Creditors offer no evidence to back up this claim, but state that "the Chancery Court ultimately determined that Minority Shareholders had failed to prove damages because equity was completely underwater . . . ." (PC Mem. 15, D.I. 20, at 20.) Morgan McClure did not read the Delaware Chancery Court opinion before deciding whether to file the Involuntary Petition. (McClure Test. 58:10-60:8, D.I. 68.) The statement that equity was "underwater" immediately after the 2008 Conversion Agreement is an inaccurate representation of the Chancery Court's opinion. While the Chancery Court held that the 2008 Conversion Agreement was procedurally unfair and constituted "self-dealing" by Metrogate's board, it also found that the "value of the plaintiff's units increased" because of the agreement. In *Ross Holding & Mgmt. Co. v. Advance Realty Grp.*, the Petitioning Creditors failed to support their contention that Metrogate was rendered insolvent by the 2008 Conversion Agreement.[62] (McGurk Test. 42:5-25, D.I. 64.) Metrogate was in covenant compliance and made payments on the Notes for a year afterwards, until the global financial crisis. (McGurk Test. 45:10-46:2, D.I. 64.)

The Petitioning Creditors also argue that the ADV/F loans are "egregious" "cash traps" created for "dissipating assets." From Mr. McGurk's credible testimony, the loans appear to be more of the sort necessitated during the financial crisis when a company had to keep the lights on or they would be turned off permanently. There is no credible evidence that the purpose of the

---

[62] 2014 Del. Ch. LEXIS 173, at *3 (Del. Ch. Sept. 4, 2014), Metrogate Ex. 18, at 1-2, D.I. 47-2, at 2-3.

loans was for anything other than operating the company. There was no evidence that siphoning assets was the purpose of the loans.

<u>Did the Creditors Make a Reasonable Inquiry Into the Relevant Facts and Pertinent Law Before Filing?</u>

The loans and payments, given as the primary reason for filing the Involuntary Petition, that "would not have been disclosed but for the State Court Action" (McClure Decl. ¶ 34, D.I. 21, at 8), were substantially the same as those described in the original 2013 Complaint in the NY State Action.[63] (Metrogate Ex. 31, ¶¶ 128-30, D.I. 47-4, at 108.) The existence and terms of the ADV/F loans were also disclosed in the Notes section in several years of Metrogate's financial statements. (Metrogate Ex. 29, at 29 Note 16, D.I. 47-4, at 46; Metrogate Ex. 30, at 32 Note 16, D.I. 47-4, at 82.) Mr. McClure stated that he at least "skimmed" the financial statements (McClure Test. 43:5-10, D.I. 68) but might have "missed it" (McClure Test. 49:25-50:5, D.I. 68).[64]

The Petitioning Creditors' claim that the 2008 Conversion Agreement was not disclosed, but, in the 2014 motion to dismiss, the New York Court dismissed a count for fraudulent concealment of details of the Conversion Agreement on the basis that they were already aware of the agreement.[65] Despite declaring that the reason for filing the Involuntary Petition was

---

[63] Compare, from Mr. McClure's testimony: "[W]e learned there was actual cash being paid on the loans" (McClure Test. 33:18-19, D.I. 68), with ¶ 128 of the 2013 Complaint in the NY State Action stating that the terms of the loans at issue required "excessively high interest payments . . . based on available cash per annum," (Metrogate Ex. 31, ¶ 128, D.I. 47-4, at 108), and the terms contained in Note 16 of several years of disclosed financial statements: "Payments of interest and principal are due quarterly . . . based on the Subsidiary's available net cash flow" (Metrogate Ex. 29, at 29 Note 16, D.I. 47-4, at 46; Metrogate Ex. 30, at 32 Note 16, D.I. 47-4, at 82). *See also* McClure Test 43:21-50:5, D.I. 68.

[64] In his testimony, Mr. McClure agreed with opposing counsel that he had "forgotten that [he] knew about these loans no later than August 2013." McClure Test. 52:12-16, D.I. 68.

[65] *Taberna Preferred Funding II, Ltd. v. Advance Realty Group LLC*, 45 Misc.3d 1204(A), at *14 (N.Y. Sup. Ct. 2014), Metrogate Ex. 8, at 29, D.I. 16 Ex. G, at 32 ("The Taberna Funds claim that defendants fraudulently concealed the details of the Conversion Agreement. The Taberna Funds aver that their reliance on the Subordination Agreement was the reason they did not object to the Conversion Agreement (which suggests they knew about the Conversion Agreement, negating a claim that such agreement was concealed).").

"egregious" concealed loans made without the Petitioning Creditors' consent (McClure Decl.

¶ 39, D.I. 21, at 10), Mr. McClure could not articulate any basis that would have precluded

Metrogate from pursuing the reorganization,[66] or from taking the ADV/F loans, or requiring that

the loans be disclosed, or showing that the loans were anything other than at market value

(McClure Test. 24:3-26:22, D.I. 68).

　　　Had the Petitioning Creditors made a reasonable inquiry into the relevant facts, they

would have discovered that they already had in their possession the information that they

claimed to this Court they only discovered through the NY State Action, and then claimed was

the principal motivating factor behind filing the Involuntary Petition. They would have

discovered, as Metrogate has shown, that the terms of loans claimed to be undisclosed were both

described in the original 2013 Complaint in the NY State Action and only a few pages later on in

the same Notes section of Metrogate's financial statements that the Petitioning Creditors

repeatedly referenced and submitted as exhibits. I do not credit the statements of Mr. McClure

that he was unaware of the existence of the ADV/F loans in general, or that he was unaware that

payments were being made as per the terms. I do not find it a sufficient excuse that he

"skimmed" the statements, "missed" the disclosures, or that he knew about them in 2013 but

subsequently "forgot." It is axiomatic that any meaningful review of financial statements

includes *scrutiny* of the notes. "Financial statements do not stand alone. Companies prepare

accompanying notes that explain accounting policies and underlying details to amounts

---

[66] From Mr. McGurk's testimony:
　　　Q: Did Metrogate have any obligation under any of those documents to get the advanced consent of
　　　petitioning creditors before doing this reorganization?
　　　A: I don't believe so.
McGurk Test. 35:10-14, D.I. 64.

presented on the financials' face. Without reading the notes, the [reader] will miss many items that are of interest and will potentially change the [reader's] view."[67]

I find it disingenuous that the Petitioning Creditors still claim that the 2008 Conversion Agreement was concealed from them when their count for fraudulent concealment was dismissed by the NY Court on the basis that they were already aware of the agreement. Moreover, the Petitioning Creditors could not articulate precisely why Metrogate had to ask them for consent, or could not take out the ADV/F loans, or had to disclose the loans. The evidence presented that the loans were "egregious" was unconvincing.

Mr. McClure stated in his testimony that the two main reasons for making the decision to file the involuntary bankruptcy were the 2008 Conversion Agreement and the ADV/F loans. (McClure Test. 33:7-35:2, D.I. 68.) Metrogate also notes that Mr. McClure did not read the Chancery Court opinion as part of a pre-filing inquiry. (McClure Test. 58:10-60:8, D.I. 68.) The Petitioning Creditor's characterization of the Chancery Court's opinion that "Minority Shareholders had failed to prove damages because equity was completely underwater" was inaccurate. Further inquiry may have alerted Mr. McClure to this fact, which leads away from the Petitioning Creditors' unsupported assertion that Metrogate was insolvent at the time of or rendered insolvent by the 2008 Conversion Agreement and to the more likely conclusion that the global financial crisis adversely affected a company dependent upon the real estate market.

The Petitioning Creditors' inquiry into the facts and pertinent law before filing was lacking.

---

[67] HENRY F. OWSLEY & PETER S. KAUFMAN, DISTRESSED INVESTMENT BANKING: TO THE ABYSS AND BACK 194-95 (2d ed. 2015).

<u>Was There Evidence of Preferential Payments to Certain Creditors or of Dissipation</u>

<u>of the Debtor's Assets?</u>

The Petitioning Creditors strove to present both the 2008 Conversion Agreement and the

ADV/F loans and payment as per the terms as "cash traps" and willful dissipation of assets.

However, Mr. McClure was unable to state that the loans were at anything other than at market

rates. The Petitioning Creditors offered Glenn Brill, of FTI Consulting. (2/29/16 Tr. 8:6, D.I. 81

("Brill Test.").) Mr. Brill presented an Expert Report concluding that the loans were egregious

based on an internal rate of return (IRR)[68] of 43.4%. (PC Ex. 83, at 5 Fig. 2; Brill Test. 10:18-22,

D.I. 81.) However, Mr. McGurk testified on February 22, 2016, that, upon receiving a fairness

opinion with feedback regarding the ADV/F loans, Metrogate lowered the IRR to 30%. (McGurk

Test. 69:4-19, D.I. 64.) The information was also in the Supplemental McGurk Declaration filed

February 13, 2016. (Suppl. McGurk Decl. ¶ 44, D.I. 47-1, at 15.)

Metrogate argues that instead of "siphoning" or "dissipating assets," it has "been in

liquidation and has expressed its intention to do so for six years, going on seven years."

(Metrogate Closing Arg. 80:11-20, D.I. 81.)

Because the Expert Report did not address the actual terms of the loan, Mr. Brill's

testimony was of limited usefulness in determining whether the loans were other than at market

value. In light of Metrogate's credited explanation, there was no convincing evidence of

preferential payments or dissipation of assets.

<u>Was the Filing Motivated By Ill Will or a Desire to Harass?</u>

The dispute has the acrimony of a protracted fight that has now occupied three venues.

---

[68] "Internal rate of return (IRR) is a metric used in capital budgeting measuring the profitability of potential
investments. Internal rate of return is a discount rate that makes the net present value (NPV) of all cash flows from a
particular project equal to zero." *Internal Rate of Return - IRR*, INVESTOPEDIA,
http://www.investopedia.com/terms/i/irr.asp (last visited May 25, 2016).

<u>Was the Filing Used as a Tactical Advantage in Pending Actions?</u>

The Petitioning Creditors focused many of their arguments on Metrogate's purported bad faith in restructuring, obtaining loans, or stopping payment on loans as the basis for the NY State Action and now for the Involuntary Petition. However, in weighing whether a filing is a bad faith litigation tactic such as forum shopping, behavior in the underlying causes of action is not relevant. The bankruptcy court must instead examine for what purpose its jurisdiction has been invoked.

Here, Metrogate has demonstrated convincingly that, despite that many of the Petitioning Creditors' claims in the NY State Action could potentially be revived on appeal, the Petitioning Creditors have attempted to change venues to this Court as an exercise in forum shopping, to resurrect claims, such as actual and constructive fraudulent transfer for Fund I and veil piercing for all of the Funds, that did not survive the NY State Action's 2014 Dismissal Order or 2015 Leave to Amend Order.

Additionally, although the Petitioning Creditors claim that they are here due to exigent circumstances, and that they are confident of their NY State Action appeals, I find that they were aware of all of the relevant circumstances back in 2013, when their allegations appeared, substantially the same, in the 2013 Complaint. (Metrogate Ex. 31, ¶¶ 128-30, D.I. 47-4, at 108.)

I conclude that the Petitioning Creditors have invoked this Court's jurisdiction for an improper purpose: to obtain a tactical advantage in an ongoing dispute already properly pending in state court through forum shopping.

<u>Timing of the Involuntary Filing</u>

The timing, following close upon the 2015 Leave to Amend Order, in which several claims in the NY State Action were rejected, and eleven days after Metrogate filed multiple

defenses and counterclaims, is telling. The timing appears to be directly in response to pending state actions.

### Conclusion

Metrogate has carried its burden to prove bad faith by a preponderance of the evidence, and that the primary, if not sole, purpose for filing the Involuntary Petition was to engage in the bad faith litigation tactic of forum shopping.

## DAMAGES

Because the Court has made a finding of bad faith, Metrogate may be entitled to an award of damages for costs and attorney's fees, and compensatory and punitive damages pursuant to 11 U.S.C. § 303(i)(1) and (2).[69]

## CONCLUSION

For the reasons set forth above, the Motion to Dismiss is granted, and the SJ Motions are denied as moot. Further, the Court retains jurisdiction to determine awards under 11 U.S.C. § 303(i)(1) and (2); provided, however, any such request must be made within thirty (30) days of the date of the accompanying order.

An appropriate order will follow.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

Dated: May 26, 2016

---

[69] I point out to the parties that the provisions of § 303(i)(1) and (2) are *permissive* and not *mandatory*, and that, in the Court's view, there are no angels involved on either side of this dispute. As the NY Court did after a recent ruling (McGurk Test. 78:6-22, D.I. 64), I strongly encourage the parties to meet and discuss a settlement.